**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **REESHMA HAMILTON,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **NORRISTOWN STATE HOSPITAL,** | **NO. 23-4068** |
| **Defendant.** | |

## OPINION

Plaintiff Reeshma Hamilton has sued her employer, Defendant Norristown State Hospital

("Norristown") for retaliation, disparate treatment, and hostile work environment under Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").  Norristown moves for

summary judgment pursuant to Federal Rule of Civil Procedure 56 on all three counts.  For the

reasons that follow, Norristown's Motion shall be denied.

### I.    LEGAL STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Inferences to be drawn from the

underlying facts contained in the evidential sources must be viewed in the light most favorable to

the party opposing the motion."  *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*,

833 F.2d 32, 34 (3d Cir. 1987); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) (cautioning

that "courts are required to view the facts and draw *reasonable* inferences" in favor of the nonmoving party (emphasis added).  But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380.

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact."  *Id.* (citation omitted).  A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex*, 477 U.S. at 323.

## II.    FACTUAL BACKGROUND

In February 2019, Hamilton who is Black, began working as a Performance Improvement Specialist for Norristown, where, she alleges, she experienced repeated instances of race discrimination over several years.  Among other things, she alleges that she was improperly denied a promotion she had been encouraged to seek—in favor, she says, of a less qualified white employee, Laura Portnoy, who then became her direct supervisor.

Hamilton further alleges a host of racist conduct by Portnoy, and Portnoy's alleged conduct is the basis of a significant part of Hamilton's case.  Portnoy "constantly berated and yelled at" Hamilton "throughout [her] employment," Hamilton says, but did not berate or yell at

white employees.  She says that she and other Black employees were "constantly micromanaged" by Portnoy, while white employees "were allowed to work independently." Worse, Hamilton says, Portnoy "frequently used" the n-word at work.

For these reasons, Hamilton says, she "reasonably believed that she was being subjected to race discrimination" and between October 2019 and August 2020 she "made several complaints of race discrimination" to Norristown's Human Resources Department.  The complaints, she says, "were not properly addressed," and the racist incidents continued.  First, during a birthday luncheon for her and other employees, another supervisor added the refrain, "[y]ou look like a monkey, and you smell like one too," to the Happy Birthday song sung for her—Hamilton alleges that supervisor "compared [her] to a monkey" but "did not compare white employees to monkeys."  Then, Hamilton alleges, Portnoy "moved [her] to a work location that was unsuitable for [her] based on [her] job duties," while "allow[ing her] white coworkers to choose their own work locations."  Then in July 2021, Hamilton says, she "was denied overtime" by Portnoy even as "[w]hite employees were allowed to work overtime."

In July 2021 Hamilton again "made a complaint of race discrimination," and she filed additional charges with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC").  Still, for "the next several months" after that, Hamilton alleges, Portnoy "continually denied [her] access to necessary information to complete her work," and on one occasion "struck her in the shoulder."

Then, in April 2022, Hamilton "was subjected to unjustified discipline."  And after that, she alleges, the explicitly racist conduct escalated:  In May 2022, she alleges in her Complaint, a supervisor "approached an employee and said, 'we need to get all these n****rs' out of here" and then "began to sing 'n****r, n****r, n****r.'"  Hamilton says the incident "was

immediately reported" to Norristown.  It did not stop there:  That same month, Portnoy

"physically pushed" her.  And, even though Hamilton was removed from Portnoy's supervision

(and placed under the supervision of supervisor Kristen Clement), she alleges, Portnoy continued

to harass and intimidate her.

Hamilton claims that: (1) she engaged in activity protected by Title VII when she

reported incidents of discrimination, and Norristown retaliated against her by taking adverse

employment actions as a result; (2) she suffered adverse employment actions for which "[n]o

legitimate nondiscriminatory reasons exist," and circumstances surrounding those actions "give

rise to an inference of discrimination"; and, (3) Norristown "created a hostile work environment

for [her] on the basis of her race."

## III.   DISCUSSION

### A.  Count I: Retaliation

Hamilton first claims that Norristown unlawfully retaliated against her for participating in

protected activity after she reported alleged instances of discrimination.  She says that she was

harassed after she complained (both internally and by filing complaints with the PHRC and

EEOC).

Under Title VII an employer may not retaliate against an employee for "ma[king] a

charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding,

or hearing" related to Title VII discrimination.  42 U.S.C. § 2000e-3(a).  To state a claim for

unlawful retaliation, a plaintiff "must show that (1) she engaged in a protected activity; (2) she

suffered an adverse employment action; and, (3) there was a causal connection between the

participation in the protected activity and the adverse action."  *Carvalho-Grevious v. Delaware*

*State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).

### i.   *Protected Activity*

Norristown does not dispute that Hamilton engaged in protected activity when she

reported alleged incidents of discrimination to Norristown personnel, the PHRC, and the EEOC,

so the dispute will turn on whether a material dispute of fact exists as to whether Hamilton

suffered an adverse employment action and, if so, whether there was a causal connection

between the protected activity and the adverse action.

### ii.   *Adverse Employment Action*

A Title VII retaliation plaintiff "must show that a reasonable employee would have found

the challenged action materially adverse."  *Burlington N. & Santa Fe Ry. Co. v. White*,

548 U.S. 53, 68 (2006).  The material-adversity standard "separate[s] significant from trivial

harms."  *Id.*  The "ordinary tribulations of the workplace," like "petty slights or minor

annoyances"—even if retaliatory—will not suffice, because "Title VII . . . does not set forth "a

general civility code for the American workplace."  *Id.*

Norristown argues that Hamilton "cannot establish an adverse action."[1]  It contends that

"the only tangible actions that [Hamilton] can point to are the following: (1) being denied

overtime; (2) being denied promotions; and, (3) being unjustly disciplined."  (Norristown does

---

[1] There is some confusion in the briefing regarding what qualifies as an adverse action for which analysis. Norristown only directly addresses adverse employment action in the section of its Motion dedicated to Hamilton's *disparate-treatment* claim, and its section on her *retaliation* claim seems just to incorporate its disparate-treatment adverse-action analysis by reference.  It does not distinguish between the two adverse-action analyses.  Hamilton, in turn, responds in her *retaliation* section to the adverse-employment-action argument from Norristown's *disparate-treatment* section.

Norristown's imprecision injects not just formal but substantive confusion, because, as will be discussed further below, the adverse-action analysis in the retaliation context differs from that in the disparate-treatment context.  *See, e.g.*, *Davis v. City of Newark*, 285 Fed. App'x. 899, 904, (3d Cir. 2008) ("In a claim of retaliation, the standard required to show an 'adverse employment action' differs from the standard used for claims of discrimination) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006)).

not argue that such actions would not count as adverse; it argues that they did not happen.)[2]

But Hamilton does not accept Norristown's characterization of her alleged adverse action as limited to those three elements.  In fact, she argues she "did not suffer a . . . traditionally adverse behavior."  Instead, she contends, she suffered a rash of "frequent and severe" unpleasant behavior, primarily by Portnoy, that was "enough to dissuade a reasonable worker from making or supporting a charge of discrimination" and thus constitute retaliation. Specifically, in addition to the three elements discussed above (denial of overtime, denial of promotion, and unwarranted punishment), she alleges that (1) Portnoy micromanaged her and "admonish[ed her] regularly without cause, and yelled at [her]"; (2) Portnoy entered her office and "intimidated" her even though Kristen Clement had assured her Portnoy "had been instructed" not to enter her office; (3) "[n]othing was done" about Portnoy's entering her office; (4) Portnoy "would routinely (at least weekly) find a pretextual reason to come into [her] office" and "yell at" her, "interrupt" her, or "simply glare [at] her defiantly"; (5) Portnoy "would sometimes follow [her] into the bathroom for no apparent reason" and "monitor" her breaks; (6)

---

[2] First, as to overtime denial, Norristown says Hamilton "was not eligible for ordinary overtime as a management employee" but rather "could receive comp time, of which she never took advantage."  As evidence it cites the declaration of Kristen Clement, who attests that Hamilton "is designated a management employee" not eligible for overtime, that in fact Hamilton never requested overtime, and that Hamilton was eligible for comp time but never sought it.  Hamilton, on the other hand, contends that "[i]n 2021, there were two special projects," and "Portnoy offered everyone but [Hamilton] the chance to do three hours of overtime a week for the entire year."  Hamilton says she "would have accepted the overtime" and received extra pay," but instead she "lost this opportunity" and at least one white woman was given the overtime instead.  For support she cites her own affidavit.

Second, as to denial of promotion, Norristown argues that "when [Hamilton] later applied" for a different promotion (to Human Services Representative I), "she got it."  (Hamilton does not argue that any promotion denial constituted a retaliatory adverse action.)

And as to unwarranted discipline, Norristown contends that Hamilton "was disciplined because the investigation into her conduct demonstrated that she was unprofessional."  Hamilton concedes that her discipline was "substantiated," but implies that when she filed her own complaints, they were improperly found unsubstantiated.

"nothing was done" about Portnoy's following her and monitoring her; (7) Portnoy "stuck out a leg and tripped her," and another time "pushed" her; (8) again, "[n]o action was taken against Portnoy"; and, (9) she heard from another employee, who submitted a sworn affidavit, that "Portnoy was using the n-word in a professional work setting—to refer to her Black employees," and in fact Hamilton herself "heard Portnoy referring to a[] forensic support staff member as the 'n' word."   It is Hamilton's position that "[a]ny reasonable, average employee would feel uncomfortable, punished[,] and retaliated against after experiencing behavior like this after making a complaint against their manager" and "[a]ccordingly," she has "presented a legitimate form of adverse employment action."

Hamilton's argument appears to relate obliquely to the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), in which the Court explained that Title VII's anti-retaliation provision "was meant to capture those employer actions serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" 144 S. Ct. at 969 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006)). She contends that *Muldrow* "liberalized" the standard regarding what constitutes an adverse employment action in a retaliation case—after *Muldrow*, she argues, "in order for a Title VII retaliation plaintiff to show an adverse employment action, the employee need not show significant harm, and need not show she lost wages or other similar harms."

Hamilton's analysis of *Muldrow* is wrong—*Muldrow* does not support her implicit contention that ongoing harassment can constitute an adverse employment event for a Title VII retaliation analysis.  *Muldrow* did not liberalize the standard for Title VII retaliation plaintiffs.  It was a Title VII discrimination case, not a Title VII retaliation case.  (The plaintiff in *Muldrow* had been transferred from one unit to another for, she argued, discriminatory reasons.  She did

7

not allege retaliation.)  Accordingly, in that *Muldrow* addressed the discrimination not the retaliation provision of Title VII, it does not alter the standard for a retaliation analysis.[3]

The standard to evaluate whether a challenged action is materially adverse in the context of a retaliation claim has been set by the Third Circuit.  First, "[r]etaliatory conduct other than discharge or refusal to rehire" is protected "if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affect[s] his [or her] status as an employee."  *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997), *overruled on other grounds by White*, 548 U.S. 53 (2006)[4] (quotations removed).  And "not everything that makes an employee unhappy qualifies as retaliation."  *Id.*

Then, in *Jensen v. Potter*, the Third Circuit addressed whether "severe or pervasive retaliatory harassment" can give rise to a Title VII retaliation claim under the Court's *Robinson* framework.  435 F.3d 444, 448 (3d Cir. 2006), *overruled on other grounds by White*, 548 U.S. 53

---

[3] To the extent *Muldrow* addresses retaliation at all, it is only to restate the retaliation standard set out in *White* and limit that standard to the retaliation context by declining to import it into the substantive-discrimination context.  In *White*, as *Muldrow* explains, the Court "held that Title VII's anti-retaliation provision—which prohibits an employer from taking action against an employee for bringing or aiding a Title VII charge—applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm."  *Muldrow*, 144 S. Ct. at 969.  *White*, the Court further explains, "adopted that standard for reasons peculiar to the retaliation context.  The test was meant to capture those employer actions serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Id.*  The Court explicitly declined to apply *White*'s Title VII retaliation framework to the Title VII discrimination case before it.  It did not "liberalize" (or alter in any other way) the Title VII retaliation standard.

[4] *White* 'overruled' *Robinson* in the sense that it expanded *Robinson*.  In *White*, the Third Circuit held that *Robinson* was wrong to limit retaliation claims to employers' workplace conduct only; it held that employers' actions outside the workplace can constitute retaliation against protected conduct, too but did not disturb *Robinson*'s underlying analysis as to what constitutes workplace retaliation.

(2006).[5]  In that case, the plaintiff engaged in protected activity by complaining about a supervisor's unwanted sexual advance, the supervisor was fired, and a constellation of harassment followed:  She was moved to an uncomfortable standing desk (which her newly fired harasser had previously occupied), a coworker began to insult her and call her obscene names, the same coworker purposely startled her and threatened her by driving carts rapidly toward her, and, for 19 months, nothing was done.  She argued that this flurry of harassment related to her complaint constituted an adverse employment action for purposes of the Title VII retaliation analysis.

The Third Circuit agreed.  It disapproved the approach of the Fifth and Eighth Circuits, which limited retaliatory adverse actions to "ultimate employment actions," and therefore "d[id] not view harassment to be within the statute's reach."  *Id.*  "[D]iscriminatory ridicule or abuse," the Third Circuit explained, "can so infect a workplace that it alters the terms or conditions of the plaintiff's employment" to the extent that it gives rise to a Title VII hostile-work-environment claim; therefore, the Court reasoned, "[i]f harassment can alter the terms or conditions of employment under § 2000e–2" (the provision that protects employees from hostile work environments), "then *Robinson* teaches that the same is true under § 2000e–3," the provision that protects employees from retaliation.  *Id.* at 449.  "Put another way, § 2000e–3(a) prohibits a quantum of discrimination coterminous with that prohibited by § 2000e–2(a)."  *Id.* at 448.

Following *Jensen*, District courts have frequently found that repeated harassment can constitute a retaliatory adverse action.  *See, e.g.*, *Robinson v. SEPTA*, 2024 WL 1936242, at *6

---

[5] *White* overruled *Jensen* in the same way it overruled *Robinson*—it did not disturb *Jensen*'s logic regarding retaliatory harassment.

(E.D. Pa. May 1, 2024) (noting that *Jensen* recognizes retaliatory harassment as actionable under Title VII and explaining that, as taught by *White*, "[i]n a retaliatory harassment claim, harassment that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination is sufficient to establish an adverse employment action") (quotations removed); *Vollmar v. SPS Techs., LLC*, 2016 WL 7034696, at *9 (E.D. Pa. Dec. 2, 2016) (explaining that "the standard for an adverse action in retaliation claims differs" from the standard in a pure discrimination claim, and that [i]n retaliation claims, if the action taken by the [defendant] would tend to dissuade a reasonable employee from engaging in future protected action, it would suffice to form the adverse action requirement.") (quotations removed); *Seybert v. Int'l Grp., Inc.*, 2009 WL 722291, at *22 (E.D. Pa. Mar. 17, 2009) (noting that "retaliatory harassment may constitute a 'materially adverse' action for retaliation claims" and holding that a supervisor's pattern of yelling at a plaintiff, berating her, giving her poor performance reviews, and interfering with her work qualified as material adversity).

Hamilton has cited to record evidence showing a host of abusive interpersonal interactions, intimidation, and interference with her daily work from which, under the *Robinson*/*Jensen* standard, a reasonable jury could find a materially adverse retaliatory action.

### iii.   Causation

Norristown declares that Hamilton "cannot establish an adverse action that is causally connected to her complaints," but it makes no further argument and cites no record evidence regarding causation. Accordingly, summary judgment on causation will not be granted. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) ("The party seeking summary judgment has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.") (quotations removed).

10

For the reasons set forth above, summary judgment will be denied as to Plaintiff's retaliation claim.[6]

## B.  Count II: Race Discrimination - Disparate Treatment

Hamilton next claims that Norristown discriminated against her by treating her differently because she is Black.  In particular, she alleges that Norristown denied her a promotion, and that the circumstances surrounding the denial give rise to an inference of discrimination.  Hamilton had sought promotion to the position of Risk Management and Quality Assurance Coordinator shortly after she was initially hired.  She was interviewed for the position, along with several other candidates.  She did not get the position; instead, Portnoy was chosen.

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  As both parties note, disparate-treatment claims involving indirect evidence of discrimination are evaluated under the burden-shifting framework announced in *McDonnell Douglas v. Green*. 411 U.S. 792, 802 (1973).

Under that structure, the plaintiff must first establish a *prima facie* case of employment discrimination, which requires showing: (1) that she was a member of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse employment action; and, (4) that adverse employment action occurred under circumstances that could give rise to an

---

[6] In its Motion's introduction, Norristown gestures briefly at an additional argument:  "As to the retaliation claim, [Norristown] took every remedial measure to ensure a positive work environment for [Hamilton]."  It does not elaborate or aver any evidence in support of this argument, so this argument need not be considered further.

inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). This test "'is not onerous' and poses 'a burden easily met.'" *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Then, once a plaintiff has established the *prima facie* case, "the burden shifts to the employer to provide a legitimate . . . reason for its conduct." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (citation omitted). If the employer does so, the burden shifts back to the employee, who must produce "evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citations omitted). To carry this burden, the plaintiff must offer "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

### i.    *Prima facie case*

Norristown maintains that Hamilton "can only satisfy the first prong of the *prima facie* case." It argues that she was not qualified (the second prong), that she suffered no adverse employment action (the third prong), and that there can be no inference of intentional discrimination (the fourth prong).

### a.   Hamilton's qualification

Norristown argues that Hamilton was unqualified for three reasons: first, that she sought the position "three weeks after she started her employment" and "[s]uch a sudden rise in the

ranks has not been seen since the likes of John Tyler," who "assumed the role as our 10th President of the United States 31 days after being sworn in as vice President due to the death of President William Henry Harrison"; second, that "[w]hile a white applicant was indeed given the position"—Portnoy—"that candidate's interview went better, and she had more experience"; and third, that "[h]er interview went poorly."  Although Norristown fashions all three of these reasons as rebuttals to Hamilton's *prima facie* case, only the first (that she was new to the job) addresses qualification for the position.  The latter two arguments (that Portnoy "had more experience" than Hamilton and that Portnoy's interview "went better" than Hamilton's) are really arguments that Norristown had a legitimate nondiscriminatory reason to choose Portnoy over Hamilton for the promotion (the second step of the *McDonnell Douglas* framework) and therefore will be addressed further below.

As to the first argument (Hamilton's recent hiring and her comparability to John Tyler), Norristown cites no caselaw supporting its apparent inference that a candidate's recent hiring into one role renders her unqualified for another.  And in any case, the *prima facie* analysis only "requires an inquiry into whether [the plaintiff] possessed the *minimal objective qualifications* for the position."  *Fowler v. AT&T, Inc.*, 19 F.4th 292, 303 (3d Cir. 2021).  In an affidavit, Hamilton states that she was asked to apply for the job by Renee Ostrander of Human Resources "because I had the proper qualifications."  That statement is not contradicted by the Defendant. An affidavit, "when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment," even "where . . . the information is self-serving."  *Paladino v. Newsome*, 885 F.3d 203, 209 (3d Cir. 2018).  Hence, there is sufficient evidence in the record before the Court from which a reasonable jury could conclude that Hamilton was qualified for the position she did not get.

13

b.  Adverse employment action

Norristown next argues "there is no evidence of an adverse employment action."  It contends that "in this Circuit . . . only actions such as a reduction in pay, termination, or suspension without pay are sufficiently adverse" to qualify for a Title VII disparate-treatment analysis.  For support it cites *Jones v. SEPTA*, 796 F.3d 323 (3d Cir. 2015).  In *Jones* the Third Circuit held that a suspension with pay "does not constitute an adverse action in the [Title VII] substantive discrimination context."  796 F.3d at 325.  But *Jones* is silent on whether a failure to promote can constitute an adverse action.  Norristown also cites *Stewart v. Union Cty. Bd. of Educ.*, 655 F. App'x. 151 (3d Cir. 2016), in which the Third Circuit held that "[e]mployment actions such as lateral transfers and changes of title or reporting relationships have generally been held not to constitute adverse employment actions."  *Stewart*, 655 F. App'x at 157.  Apart from it being a non-precedential opinion and that it does not address a failure to promote, any weight that could be given to *Stewart* in this context has been lifted by the Supreme Court's finding in *Muldrow* that even an ostensibly "lateral" transfer (*e.g.*, even one that does not result in a change in "rank" or "pay") *can* constitute an adverse employment action so long as *some* "disadvantageous" change "in an employment term or condition" has resulted.  *Muldrow*, 144 U.S. at 974.

More to the point, a failure to promote *can* constitute a Title VII disparate-treatment adverse action.  *See Weston v. Pennsylvania*, 251 F.3d 420, 430-31 (3d Cir. 2001) ("The Supreme Court has defined a tangible, adverse employment action as a 'significant change in employment status, such as hiring, firing, *failing to promote*, reassignment, or a decision causing a significant change in benefits'") (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749

14

(1998)) (emphasis added).[7]

It is undisputed that (at least as the parties have characterized Norristown's decision not to hire Hamilton for the position) Hamilton was denied a promotion.  And as the denial of a promotion can constitute a Title VII disparate-treatment adverse-employment action a jury could find that Norristown's failure to promote Hamilton was an adverse action.

c.   Circumstances that give rise to an inference of discrimination

Norristown argues that "[t]here can be no inference of intentional discrimination by [Hamilton]'s supervisors *after she is placed under the supervision of [Kristen] Clement*" (emphasis added).  It contends that Hamilton "was placed under the supervision of Kristen Clement promptly after [she] complained of bullying and harassment," and "[t]herefore, any claims that she was discriminated against after that are baseless."

But the specific adverse employment action Hamilton alleges—the denial of promotion—occurred before Hamilton was placed under Clement's supervision.  Norristown makes no argument about any inference of discrimination regarding events that occurred before Hamilton was placed under Clement's supervision.  Accordingly, a genuine dispute exists as to the allegedly discriminatory circumstances surrounding the promotion denial.

ii.   *Legitimate reason for the failure to promote*

As explained above, once a plaintiff has established a *prima facie* case, the burden shifts back to the defendant to provide a legitimate, nondiscriminatory reason for the adverse action.  Norristown argues first that Portnoy "had more experience," and second, that Hamilton's

---

[7] Indeed, as Norristown notes, to constitute an adverse action, "an employer's discrimination must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."   *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).  A promotion may affect all of these.

interview "went poorly" and Portnoy's "went better."

As to the first (Hamilton's relative experience versus Portnoy's), Norristown argues simply that Portnoy had "more."  And there, a genuine dispute does exist:  Hamilton argues (and the record corroborates) that she "had a Masters in Human Services, and was working toward her Ph.D. in Behavior Science" and that she "had over 18 years of experience in the human service field, and 5 years' experience as a supervisor," while Portnoy "has a B.S. in Dietetics and worked as a Clinical Dietician for [Norristown] for a year and nine months."  Norristown does not explain specifically what sort of "experience" it argues Portnoy had more of, but the facts Hamilton avers create a genuine dispute regarding whether she or Portnoy had more (at the very least as measured by time in a potentially relevant field).

Norristown also argues that Hamilton's interview "went poorly" and Portnoy's "went better."  It cites to the declaration of Kristen Clement, who attests to as much.  Clement also attests that Portnoy was the "fifth best" candidate interviewed, but Norristown "could not provide the desired salary to the top four candidates who turned down the position."  (And, therefore, Portnoy was the best candidate out of those willing to accept the salary.)  Clement further attests that Hamilton's interview placed her "at the bottom of the applicant pool."  Poor performance if clearly set forth by the Defendant through the introduction of admissible evidence may serve as a legitimate reason for a failure to promote.  *Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 333 (3d Cir. 2000).  However, particularly when there is nothing contemporaneous to the interview in the record to support that reason, *Thompson v. Bridgeton Bd. of Educ.*, 613 Fed App'x 105, 108 (3d Cir. 2015); *Carr v. New Jersey*, 534 Fed App'x 149, 152-53 (3d Cir. 2013); *McCann v. Astrue*, 293 Fed App'x 848, 851 (3d Cir. 2008), there is a concern that "a decision made principally on the basis of a subjective interview . . . is a ready tool for

discrimination," *Narin*, 206 F.3d at 333.  Here, where the Plaintiff has already refuted the first of Defendant's proffered legitimate reasons, there is no need to evaluate its second one.

For the reasons set forth above, Norristown Motion for summary judgment on Hamilton's disparate-treatment claim will be denied.

### C.  Count III: Hostile Work Environment

As the parties agree, a hostile-work-environment plaintiff must establish: "(1) the employee suffered intentional discrimination because of his/her [race], (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability."  *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017).[8]  Hamilton claims that the litany of allegedly harassing actions by Portnoy and others were sufficiently discriminatory to constitute a hostile work environment.

Norristown's arguments in response are unclear, but it seems to raise two.  First, it cites cases regarding the second prong ("severe or pervasive" harassment), apparently to imply that Hamilton has not shown "the harassing behavior [was] sufficiently severe or pervasive to alter the conditions of [her] employment."  Second, it argues directly that Hamilton cannot satisfy the fifth prong (establishing Norristown's liability for its employees' actions) because Norristown was not negligent in controlling Hamilton's working conditions.

---

[8] *Moody* was a sex-discrimination case, not a race-discrimination case, but "[h]ostile work environment claims based on racial harassment are reviewed under the same standards as those based on sexual harassment."  *Griffin v. Harrisburg Prop. Servs., Inc.*, 421 Fed App'x 204, 207 (3d Cir. 2011) (citing *AMTRAK v. Morgan*, 536 U.S. 101, 116 n.10 (2002)).

### i.   *Severity/pervasiveness of the alleged harassment (Prong 2)*

Norristown's case citations imply an argument that Hamilton has not shown her harassment was sufficiently severe or pervasive to satisfy the requirement for a Title VII hostile-work-environment claim.  First it quotes *Vance v. Ball State Univ.*, 570 U.S. 421 (2013), in which the Supreme Court explained that a Title VII hostile-work-environment plaintiff must "show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered."  570 U.S. at 427.  Next it quotes *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); in that case, the Court held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not amount to a hostile work environment.  524 U.S. at 778.

It is not clear whether Norristown means to characterize Hamilton's allegations—which include, among other things, the repeated use of the n-word in her workplace—as "simple teasing, offhand comments, [or] isolated incidents," because Norristown cites no facts and does not develop the argument further.

The Third Circuit has clarified that a hostile work environment can result when harassment is "severe *or* pervasive"—it need not be both.  *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017).  The Court explained that the "severe-or-pervasive" analysis is "context-specific" and "requires looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Id.*  Here, the conduct Hamilton alleges touches on all those criteria.  The harassment she alleges:

1.  Was *frequent*—Hamilton alleges Portnoy "[y]ell[ed] and berat[ed] her on a daily to

weekly basis" and micromanaged her for "the length of Portnoy's supervision";

2. Was severe—Hamilton alleges Portnoy used the n-word "multiple times" in the workplace, to the extent that a white coworker complained)

3. Was physically threatening or humiliating—Hamilton alleges Portnoy "st[ood] over her while she worked," entered her office to "glare [at]" or otherwise "intimidate[]" her, "stuck out a leg and tripped her" and on another occasion "pushed [Hamilton] with her shoulder"); and,

4. Unreasonably interfered with her work performance—Hamilton alleges Portnoy "[f]ail[ed] to provide her with proper training," "st[ole] her work product and t[ook] credit for it," "[b]lam[ed] her for poor work that was not her work product," "moved" her office "without her consent or choice" and placed her "in an office with only Black employees," "sabotaged [her] work by not giving her important information and/or documents," and told her that she (Portnoy) "believed in making the environment hostile so that employees would quit."

Any use of the n-word in an employment setting is unquestionably severe.  That epithet "has been aptly described as the 'paradigmatic slur' toward African Americans and the 'most socially consequential insult.'" *Boyle v. Evanchick*, 2020 WL 1330712, at *6 (E.D. Pa. Mar. 19, 2020) (citing Randall Kennedy, *N****r: The Strange Career of a Troublesome Word*, at 22, 35 (Pantheon Books, 2002)).  Indeed, in *Castleberry*, the Court determined that a *single* use of the n-word "can suffice to state a claim" in some circumstances.  863 F.3d at 264.  Here, the use of that particular slur, taken with the rest of the actions surrounding it, provide more than enough to generate a genuine dispute of material fact regarding the severity and pervasiveness of the harassment Hamilton alleges.

### ii.    *Norristown's liability (Prong 5)*

Next Norristown argues that it "cannot be held liable for creating or allowing a hostile work environment" because it was not negligent and "did everything it could to investigate claims and resolve issues."  First it cites *Vance*:

Under Title VII, an employer's liability for such harassment may depend on the status of the harasser.  If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.

570 at 424.

Norristown's citation to *Vance* and ensuing negligence argument only makes sense if Norristown means to imply that Portnoy was Hamilton's "co-worker," not her "supervisor," because *Vance* holds that "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id.* But when the harasser is a supervisor, as *Vance* explains, "different rules apply." *Id.*

In that case, "[i]f the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Id.* But "if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.*

The first question, therefore, is whether Portnoy (Hamilton's primary alleged harasser) was her "co-worker" or her "supervisor." Although both parties repeatedly refer to Portnoy as Hamilton's "supervisor," the Supreme Court has supplied a precise definition and warned that "colloquial" references to a harasser as a "supervisor" are not dispositive. *Id.* at 432. Under *Vance*, a supervisor is one whom a plaintiff's employer has "empowered . . . to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.*. at 431.

Norristown makes no argument to establish whether Portnoy was Hamilton's

"supervisor" or her "co-worker" under the *Vance* framework.  But Hamilton addresses the point directly:  Portnoy, Hamilton argues, "had the ability to assign projects and move [her] office, and controlled [her] ability to earn overtime and conducted her performance reviews."  (And Norristown itself says Portnoy engaged in the "*direct* supervision" of Hamilton.)  At the very least Hamilton has shown that a genuine dispute exists regarding whether Portnoy could "take tangible employment actions against" her, and therefore regarding Portnoy's status as her supervisor.[9]

Because Norristown has failed to establish that there is no genuine dispute of material fact exists regarding the severity and pervasiveness of the alleged harassment, or regarding its liability for the actions of its employees vis-à-vis Hamilton, summary judgment will be denied as to Hamilton's hostile-work-environment claim.

An appropriate order follows.

BY THE COURT:

 /s/Wendy Beetlestone, J.

_____

WENDY BEETLESTONE, J.

---

[9] Because Hamilton has established a genuine dispute exists regarding whether Portnoy was her supervisor, Norristown's argument regarding its negligence (which only applies if Portnoy is a co-worker, not a supervisor) need not be addressed.